# Linda Dillon v. Champion Jogbra, Inc.

[819 A.2d 703]

No. 00-560

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed December 27, 2002

*Pietro J. Lynn, Heather E. Thomas* and *Jennifer G. Mihalich* of *Lynn & Associates, P.C.*, Burlington, for Plaintiff-Appellant.

*Donald J. Rendall, Jr.* and *Eric E. Hudson* of *Sheehey Furlong Rendall & Behm P.C.*, Burlington, for Defendant-Appellee.

¶ 1. **Morse, J.** Plaintiff Linda Dillon appeals an order of the superior court granting summary judgment to defendant Champion Jogbra, Inc. in her action for wrongful termination. Dillon contends that the trial court erroneously concluded as a matter of law that Dillon's at-will employment status had not been modified by Jogbra's employment manual and employment practices, and that the undisputed material facts failed to give rise to a claim for promissory estoppel supporting a claim for wrongful discharge. We affirm with respect to Dillon's claim for promissory estoppel, but reverse and remand on her breach of contract claim.

¶ 2. On appeal from an order of summary judgment, we apply the same standard as the trial court. *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 28, 742 A.2d 734, 736 (1999). "[I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that [the moving] party is entitled to a judgment as a matter of law," then summary judgment is proper. V.R.C.P. 56(c)(3). When determining whether genuine issues of material fact exist for trial, we resolve all doubts in favor of the nonmoving party. *O'Donnell v. Bank of Vt.*, 166 Vt. 221, 224, 692 A.2d 1212, 1214 (1997). The nonmoving party, however, "may not rest upon the mere allegations or denials in its pleadings, 'but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *White*, 170 Vt. at 28, 742 A.2d at 736 (quoting V.R.C.P. 56(e)). A dispute with regard to the legal significance of a fact or facts, as opposed to the facts themselves, will not preclude summary judgment. *Tooley v. Robinson Springs Corp.*, 163 Vt. 627, 629, 660 A.2d 293, 295-96 (1995) (mem.), cited in *Beecher v. Stratton Corp.*, 170 Vt. 137, 144, 743 A.2d 1093, 1099 (1999).

¶ 3. Our review of the record provided by the parties to the trial court, giving the benefit of all doubts and inferences to Dillon, establishes the facts: Jogbra has an employee manual that it distributes to all employees at the time of their employment. The first page of the manual states the following in capitalized print:

> The policies and procedures contained in this manual constitute guidelines only. They do not constitute part of an employment contract, nor are they intended to make any commitment to any employee concerning how individual employment action can, should, or will be handled.

> Champion Jogbra offers no employment contracts nor does it guarantee any minimum length of employment. Champion Jogbra reserves the right to terminate any employee at any time "at will," with or without cause.

¶ 4. During the period from 1996 to 1997, however, Jogbra developed what it termed a "Corrective Action Procedure." This procedure established a progressive discipline system for employees and different categories of disciplinary infractions. It states that it applies to all employees and will be carried out in "a fair and consistent manner." Much of the language in the section is mandatory in tone.

¶ 5. Linda Dillon began working for Jogbra part-time in January 1997. She was hired on as a full-time employee in August 1997 in the position of "charge-back analyst." In the summer of 1998, the position of "sales administrator" was going to become vacant. Dillon was approached by Jogbra management about applying for the position, which started on July 31. She eventually decided to apply and interviewed for the position. In the course of interviewing for the

position, Dillon recalls that she was told that she would receive "extensive training." More specifically, she was told by the human resources manager that she would overlap with her predecessor who would train her during those days. Originally, her predecessor was scheduled to leave August 15. In the course of Dillon's interview with the vice president of sales, who would be her immediate supervisor, he informed her that her predecessor was actually leaving earlier and would be available for only two days of training before Dillon started the job. He reassured her, though, that the predecessor would be brought back sometime thereafter for more training. Dillon also recalls that he told her that "it will take you four to six months to feel comfortable with [the] position," and not to be concerned about it. Dillon was offered and accepted the position. She spent most of her predecessor's remaining two days with her. Her predecessor then returned in early September for an additional two days of training. Dillon stated that she felt that, after the supplemental training, she had received sufficient training for the job.

¶ 6.   On September 29, Dillon was called into her supervisor's office. The human resources manager was also present. They informed Dillon that things were not working out and that she was going to be reassigned to a temporary position, at the same pay and benefit level, that ended in December. She was told that she should apply for other jobs within the company, but if nothing suitable became available, she would be terminated at the end of December. According to Dillon, her supervisor stated that he had concluded within ten days of her starting that "it wasn't going to work out." Prior to the meeting, Dillon was never told her job was in jeopardy, nor did Jogbra follow the procedures laid out in its employee manual when terminating her.

¶ 7.   Dillon applied for one job that became available in the ensuing months, but was not selected for it. She left Jogbra in December when her temporary position terminated. Dillon then brought suit against Jogbra for wrongful termination. She asserted claims for breach of contract and promissory estoppel. Jogbra filed a motion for summary judgment, which the trial court granted. She now appeals to this Court.

## I.

¶ 8.   Dillon contends that the trial court erroneously determined, as a matter of law, that Jogbra had not unilaterally altered her at-will employment status by means of its employment manual and practices. Dillon contends that this matter should have been left for a jury to determine.

■ ¶ 9. In approaching this issue, we are mindful at the outset that at-will employment relationships have fallen into disfavor. See C. Estlund, *Wrongful Discharge Protections in an At-Will World*, 74 Tex. L. Rev. 1655, 1655-56 (1996) (noting the numerous exceptions that have evolved in second half of twentieth century to the at-will doctrine and the narrowing of the debate over its further limitation); see generally D. Ballam, *Employment At-Will: The Impending Death of a Doctrine*, 37 Am. Bus. L. J. 653, 687 (2000) (predicting the end of the doctrine's viability given state of employment law). In the implied contract context, we have noted the motivating policy considerations that inform this trend: when an employer takes steps to give employees the impression of job security and enjoys the attendant benefits that such an atmosphere confers, it should not then be able to disregard its commitments at random. See *Taylor v. Nat'l Life Ins. Co.*, 161 Vt. 457, 464, 652 A.2d 466, 471 (1993) (citing the leading case *Toussaint v. Blue Cross & Blue Shield of Mich.*, 292 N.W.2d 880, 892 (Mich. 1980)).

■ ¶ 10. Additionally, it must be remembered when analyzing Dillon's argument that principles of contract law govern such determinations. See *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 19, 665 A.2d 580, 584 (1995); see also *Marcoux-Norton v. Kmart Corp.*, 907 F. Supp. 766, 774 (D. Vt. 1993). In fact, we have noted repeatedly that the presumption that employment for an indefinite term is an "at-will" agreement is simply a general rule of contract construction. See, e.g., *Ross*, 164 Vt. at 19, 665 A.2d at 584; *Taylor*, 161 Vt. at 462, 652 A.2d at 470; *Foote v. Simmonds Precision Prods. Co.*, 158 Vt. 566, 570, 613 A.2d 1277, 1279 (1992). "The rule imposes no substantive limitation on the right of contracting parties to modify terms of their arrangement or to specify other terms that supersede the terminable-at-will [arrangement]." *Foote*, 158 Vt. at 570, 613 A.2d at 1279. Additionally, an employer may modify an at-will employment agreement unilaterally. *Id.* at 571, 613 A.2d at 1279-80. When determining whether an employer has done so, we look to both the employer's written policies and its practices. *Benoir v. Ethan Allen, Inc.*, 147 Vt. 268, 270, 514 A.2d 716, 718 (1986); see also *Raymond v. IBM Corp.*, 954 F. Supp. 744, 748 (D. Vt. 1997) (noting under Vermont law "[a]t-will employment contracts may be modified by . . . the personnel policies or practices of the employer"). An employer not only may implicitly bind itself to terminating only for cause through its manual and practices, but may also be bound by a commitment to use only certain procedures in doing so. See *Ross*, 164 Vt. at 21-22, 665 A.2d at 585.

¶ 11. At least one court has interpreted our case law to hold that the interpretation of employment manuals is *always* a question for the jury. *McKenny v. John V. Carr & Son, Inc.*, 922 F. Supp. 967, 978 (D. Vt. 1996) ("Vermont courts have consistently held that it is for a jury to determine whether a handbook has established contractual rights."); see also *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1022 (2d Cir. 1995) (making general statement that "[u]nder Vermont law, disputes concerning the agreed-upon terms and conditions of an employment contract are an issue of fact for the jury"). A closer reading of our case law, however, demonstrates that only when the terms of the manual are *ambiguous* should the question be submitted to the jury. *Farnum v. Brattleboro Retreat, Inc.*, 164 Vt. 488, 494, 671 A.2d 1249, 1254 (1995) (holding that where the provisions of the employee handbook sent "mixed messages," question of whether the handbook created an implied contract was properly submitted to the jury); see also *Taylor*, 161 Vt. at 461-67, 652 A.2d at 469-72 (where terms of manual were inconsistent with at-will status and hiring letter stating terms of employment relied on by both parties was "ambiguous," jury's finding that employment contract restricted employer to termination for cause was supported by the record).

¶ 12. We have not abrogated, in the employment context, the long-standing law of contract that the interpretation of *unambiguous* writings is a matter of law for the court, see *John A. Russell Corp. v. Bohlig*, 170 Vt. 12, 16, 739 A.2d 1212, 1216 (1999) (noting that, if a court determines that a contract is unambiguous, "it must declare the interpretation as a matter of law"), as is the determination of *whether* a writing is ambiguous. *New England P'ship v. Rutland City Sch. Dist.*, 173 Vt. 69, 75, 786 A.2d 408, 414 (2001); *Bohlig*, 170 Vt. at 16, 739 A.2d at 1216; see also *Benoir*, 147 Vt. at 271-72, 514 A.2d at 718-19 (noting that "[w]here the essential terms of a contract are expressly stated in clear and definite terms, the interpretation of the writing is for the court," and holding trial court properly determined as a matter of law that employee handbook had modified at-will status such that employees could be terminated only for cause) (internal quotation marks and citation omitted). Only after a determination that the writing is ambiguous should the interpretation of the writing be submitted to the jury. See *New England P'ship*, 173 Vt. at 77, 786 A.2d at 415; *Bohlig*, 170 Vt. at 16, 739 A.2d at 1216.

¶ 13. When the terms of a manual are ambiguous, however, or send mixed messages regarding an employee's status, the question of whether the presumptive at-will status has been modified *is* properly

left to the jury. *Farnum*, 164 Vt. at 494, 671 A.2d at 1254; see also *Taylor*, 161 Vt. at 461-67, 652 A.2d at 469-72. This may be the case even if there is a disclaimer stating employment is at-will, as the presence of such a disclaimer is not dispositive in the determination. See *Farnum*, 164 Vt. at 494, 671 A.2d at 1254 ("The mere inclusion of boilerplate language providing that the employee relationship is at will cannot negate any implied contract and procedural protections created by an employee handbook."). Furthermore, an employer's practices can provide context for and help inform the determination. See *Benoir*, 147 Vt. at 270, 514 A.2d at 718; *Raymond*, 954 F. Supp. at 748.

¶ 14. The question of whether a written manual is ambiguous is a determination of law that we review de novo. See *Bohlig*, 170 Vt. at 16, 739 A.2d at 1216; cf. *Benoir*, 147 Vt. at 271-72, 514 A.2d at 718-19 (holding trial court properly determined as a matter of law that *un*ambiguous terms in employee manual that were inconsistent with at-will employment relationship created an implied contract foreclosing employer's right to terminate without cause). In this case, we cannot agree with the trial court that the terms of Jogbra's manual are unambiguous such that, as a matter of law, Dillon's status was not modified, especially considered in light of the conflicting record before the court regarding Jogbra's employment practices. Cf. *Farnum*, 164 Vt. at 494, 671 A.2d at 1254 ("Given the contents of [employer's] handbook provisions, we conclude that it was, *at best from [employer's] perspective*, a jury question as to whether the handbooks created an implied contract.") (emphasis added); *Sherman v. Rutland Hosp., Inc.*, 146 Vt. 204, 208-09, 500 A.2d 230, 233 (1985) (noting court properly submitted question to jury of whether at-will status modified when employee argued that his oral negotiations during the hiring process had resulted in greater protections for him individually, *notwithstanding* his concession that manual standing on its own did not modify general at-will status).

¶ 15. Notwithstanding the disclaimer contained on the first page of the manual quoted above, the manual goes on to establish in Policy No. 720 an elaborate system governing employee discipline and discharge. It states as its purpose: "To establish Champion Jogbra policy for all employees." It states that actions will be carried out "in a fair and *consistent* manner." (Emphasis added.) It provides that "[t]he Corrective Action Policy *requires* management to use training and employee counseling to achieve the desired actions of employees." (Emphasis added.) It establishes three categories of violations of company policy and corresponding actions to be generally taken in each

case. It delineates progressive steps to be taken for certain types of cases, including "[u]nsatisfactory quality of work," and time periods governing things such as how long a reprimand is considered "active." Cf. *Taylor*, 161 Vt. at 461-62, 465, 652 A.2d at 469-70, 471 (noting that manual provisions stating, among other things, that employees would be treated fairly and uniformly, that progressive discipline should be used except in the case of serious misconduct, and listing circumstances that may result in termination were sufficient to support jury's determination that employer unilaterally modified at-will arrangement such that it could only terminate for cause). All of these terms are inconsistent with the disclaimer at the beginning of the manual, in effect sending mixed messages to employees. Furthermore, these terms appear to be inconsistent with an at-will employment relationship, its classic formulation being that an employer can fire an employee "for good cause or for no cause, or even for bad cause." D. Ballam, *supra*, at 653 n.4 (quoting *Payne v. W. & Atl. R.R.*, 81 Tenn. 507, 518-20 (1884) (overruled on other grounds by *Hutton v. Watters*, 179 S.W. 134, 138 (Tenn. 1915)).

¶ 16. With respect to the record before the court on Jogbra's employment practices, Dillon herself was aware of at least one employee whose termination was carried out pursuant to the terms set forth in the manual. She also testified in her deposition to conversations with the human resources manager, with whom she was friendly, in which the manager had described certain procedures used for firing employees. She stated that the manager had told her that Jogbra could not "just get rid of" people, but instead had to follow procedures. The human resources manager herself testified that, although the progressive discipline system was not generally applied to salaried employees, it was "historically" used for nonsalaried employees. She could only recall two instances in which the portion of the manual providing for documentation of progressive action was not followed, one of which resulted in a legal claim against the company and the other of which involved an employee stealing from the company. In fact, the manual specifically provides that stealing "will normally result in *discharge on the first offense*." (Emphasis in original.) Thus, it is not clear how that discharge deviated from the provisions of the manual.

¶ 17. In conclusion, the manual itself is at the very least ambiguous regarding employees' status, and Jogbra's employment practices appear from the record to be both consistent with the manual *and* inconsistent with an at-will employment arrangement. Therefore,

summary judgment was not proper on Dillon's breach of implied contract claim.

## II.

¶ 18. Dillon also argues that the trial court's grant of summary judgment on her claim of promissory estoppel was erroneous. Dillon based her claim on two separate statements: the assurance that she would receive training and the assurance that it would take her four to six months to become comfortable with the sales administrator position.

¶ 19. We have held that, even if an employee otherwise enjoys only at-will employment status, that employee may still be able to establish a claim for wrongful termination under a theory of promissory estoppel if that employee can demonstrate that the termination was in breach of a specific promise made by the employer that the employer should have reasonably expected to induce detrimental reliance on the part of the employee, and that the employee did in fact detrimentally rely on the promise. *Foote*, 158 Vt. at 571, 573, 613 A.2d at 1280 (noting "promissory estoppel may modify an at-will employment relationship and provide a remedy for wrongful discharge," and setting forth elements of promissory estoppel). We agree with the trial court in this case, however, that essential elements of promissory estoppel are absent with regard to both statements.

¶ 20. With respect to Jogbra's promise to Dillon that she would receive training, Dillon specifically conceded that, upon her predecessor's return in September, she had received adequate training to perform the job. In other words, Jogbra had delivered on its promise. Furthermore, even assuming that Jogbra failed to provide the full extent of promised training, Dillon has failed to explain how, as a matter of law, the promise of training modified her at-will status. Cf. *id.* at 571-72, 613 A.2d at 1280 (where manual promised that employees would not be penalized in any way for using company grievance procedure, employee established that his otherwise at-will status had been modified such that, although employer could terminate him for any other reason, it could not terminate him for his use of the grievance procedure). In other words, it is not clear from Dillon's brief how the promise of training foreclosed Jogbra from nevertheless terminating her either on an at-will basis or for cause.[1] Cf. *Taylor*, 161 Vt. at 471-72, 652 A.2d at

---

[1] In his deposition, Dillon's supervisor expressed the firm opinion that even with training, or corrective action for that matter, Dillon simply did not possess the skills necessary to

475 (employee failed to demonstrate how enforcement of promise to provide timely evaluation would have foreclosed the elimination of his position based on economic necessity).

¶ 21. With respect to the assurance that it would take four to six months to become comfortable with the position, the statement cannot reasonably be relied upon as a promise of employment in the sales administrator position for a set period of time. Courts have generally required a promise of a specific and definite nature before holding an employer bound by it. See, e.g., *Chang v. Cargill, Inc.*, 168 F. Supp. 2d 1003, 1012 (D. Minn. 2001) (generalized assertions made in course of interview that employee would have opportunities to develop trading skills not kind of definitive promise that would support claim of promissory estoppel binding employer to provide training program); see also *Kallich v. N. Iowa Anesthesia Assocs.*, 179 F. Supp. 2d 1043, 1053 (N.D. Iowa 2002) (noting in wrongful discharge case that one element of promissory estoppel is a clear and definite promise); *Willis v. New World Van Lines, Inc.*, 123 F. Supp. 2d 380, 395 (E.D. Mich. 2000) (noting "[t]he sine qua non of promissory estoppel is a promise that is definite and clear") (internal quotations omitted). An estimate of how long it would take a person to adjust to a job cannot be converted into a definite promise of employment for that period of time. Thus, the vague assurance given to Dillon is not sufficient to support her claim of promissory estoppel. See *McKenny*, 922 F. Supp. at 980 (noting mere expression of hope is not sufficiently definite to give rise to claim for promissory estoppel in employment context).

¶ 22. In sum, the trial court properly granted Jogbra summary judgment on Dillon's promissory estoppel claim.

*The grant of summary judgment on Linda Dillon's claim for promissory estoppel is affirmed; the grant of summary judgment on her breach of contract claim is reversed and remanded.*

¶ 23. **Amestoy, C.J.,** dissenting. I agree with the majority's finding that the trial court properly granted employer summary judgment on employee's promissory estoppel claim. I disagree that the trial court erred in granting employer summary judgment on employee's breach of implied contract claim. I therefore respectfully dissent.

¶ 24. The salient question in this case is whether the following language of the employment manual is ambiguous:

---

successfully perform the job of sales administrator. Specifically, he did not think that her time-management, prioritization or computer skills were adequate for the position.

THE POLICIES AND PROCEDURES CONTAINED IN THIS MANUAL CONSTITUTE GUIDELINES ONLY. THEY DO NOT CONSTITUTE PART OF AN EMPLOYMENT CONTRACT, NOR ARE THEY INTENDED TO MAKE ANY COMMITMENT TO ANY EMPLOYEE CONCERNING HOW INDIVIDUAL EMPLOYMENT ACTION CAN, SHOULD, OR WILL BE HANDLED. CHAMPION JOGBRA OFFERS NO EMPLOYMENT CONTRACTS NOR DOES IT GUARANTEE ANY MINIMUM LENGTH OF EMPLOYMENT. CHAMPION JOGBRA RESERVES THE RIGHT TO TERMINATE ANY EMPLOYEE AT ANY TIME "AT WILL," WITH OR WITHOUT CAUSE.

¶ 25. The majority offers two explanations as to why the employer's extraordinarily direct statement that it "reserves the right to *terminate any employee at any time 'at will,' with or without cause*" (emphasis added) should be construed to mean exactly the opposite of what it says. I disagree with each.

¶ 26. First, the majority concludes that additional language contained within the manual setting forth progressive steps to be taken for certain types of cases sends a "mixed message" to employees about their employee status. But the manual carefully reiterates the employer's unambiguous initial message that the discipline system is intended only as a guideline, and specifically reserves the right of managers to deviate from said guidelines in individual cases.[2]

¶ 27. We have previously noted that "disciplinary procedures are not inconsistent or in conflict with the at-will doctrine." *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 21, 665 A.2d 580, 585 (1995). A policy that expressly leaves the disciplinary sanction to the employer's discretion does not create an enforceable promise to terminate for cause. *Id.* at 21, 665 A.2d at 585. Moreover, even a statement which expressly or impliedly includes a promise to an employee for specific treatment in specific situations will not bind an employer "if it conspicuously and effectively states that the policy is not intended to be part of the employment relationship." *Id.* at 20-21, 665 A.2d at 584 (citing *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1088 (1984)). As noted above, the employment manual contained the following statement in

---

[2] "While these guidelines list the normal actions to be taken for each violation listed, they should not be automatic, and each case should be reviewed carefully to determine the appropriate action to be taken based upon the circumstances."

capital letters: "THE POLICIES AND PROCEDURES CONTAINED IN THIS MANUAL CONSTITUTE GUIDELINES ONLY. THEY DO NOT CONSTITUTE PART OF AN EMPLOYMENT CONTRACT." If the majority considers this statement to be insufficient, then it is difficult to imagine the language an employer could use in order to conspicuously state that the policy is not intended to be part of the employment relationship.

¶ 28. I do not believe that the manual at issue in this case can reasonably be construed as ambiguous. The "mixed message" the majority discerns more accurately describes the message conveyed by an opinion which observes that "at-will employment relationships have fallen into disfavor," when recently this Court cautioned against interpretations that "irreconcilably conflict[] with the employment at-will doctrine . . . and result[] in unreasonable judicial interference into what is a private relationship." *Ross*, 164 Vt. at 23, 665 A.2d at 586 (internal citations omitted). The trial court correctly determined that the terms of the employer's manual are unambiguous as a matter of law.

¶ 29. Nor do I agree with the majority's second justification that the record before the court of employer's practices created ambiguity. In support of employee's contention that employer's practices were at odds with an at-will policy, employee cites to her own deposition, wherein she claimed to have known of other employees who received progressive discipline prior to termination. When pressed, however, employee admitted that, of the three employees with whose discharge she was familiar, she could state with certainty that only one received progressive discipline. Moreover, employee stated that she was unfamiliar with the manner in which the other two employees' cases were handled prior to their discharge. While her own experience is relevant, it does not by itself suggest a definitive company wide practice. Hearsay statements about what employee "had heard" is insufficient to raise a genuine issue. See *Ross*, 164 Vt. at 22-23, 665 A.2d at 585 (plaintiff's own recollection about what other employees had told him is insufficient to support opposition to summary judgment). I would affirm the trial court's grant of summary judgment. I am authorized to state that Justice Skoglund joins in this dissent.