2013 VT 64

# Adam Cate v. City of Burlington

[79 A.3d 854]

No. 12-227

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed August 2, 2013

*Susan J. Flynn* of *Clark, Werner & Flynn, P.C.*, Burlington, for Plaintiff-Appellant.

*Pietro J. Lynn* and *Scarlett S. MacIlwaine* of *Lynn, Lynn & Blackman, P.C.*, Burlington, for Defendant-Appellee.

¶ 1. **Robinson, J.** Plaintiff filed suit for breach of contract and intentional infliction of emotional distress (IIED) against his former employer, the City of Burlington, claiming that the City disciplined him for actions and in a manner not authorized by the City's personnel manual. The trial court granted the City summary judgment, concluding that the manual unambiguously allowed the City to place plaintiff on paid administrative leave pending an investigation and proscribed plaintiff's conduct of viewing other employees' emails. The court also concluded that plaintiff had failed to demonstrate outrageous conduct sufficient to support an IIED claim. On appeal, plaintiff argues that summary judgment was inappropriate because the court misconstrued the personnel manual, there were disputed issues of fact, and there was sufficient evidence of outrageous conduct to send the IIED claim to the jury. We affirm.

¶ 2. The following facts are undisputed.[1] At the time of the relevant events, plaintiff was employed by the City of Burlington in the Parks and Recreation Department as the Waterfront Manager. Plaintiff supervised approximately thirty seasonal employees and one full-time employee, and he oversaw daily operations of the Boathouse, a City-owned property on the waterfront. Plaintiff's immediate supervisor was the Superintendent of Park Operations, Ben Pacy, who eventually left the Department to work at City Hall. After Pacy left, Cate reported directly to Robert Whalen. Wayne Gross, the Director of the Department, supervised Pacy before his departure and subsequently Whalen. When Pacy

---

[1] The City filed a statement of undisputed facts with its motion for summary judgment with citation to supporting documents. V.R.C.P. 56(c)(1)(A) (requiring party asserting fact to file "a separate and concise statement of undisputed material facts" with citation to supporting documents in the record). Plaintiff responded with his own motion for partial summary judgment and his own statement of undisputed facts. Plaintiff responded to the facts set forth in the City's motion, arguing generally that the facts set forth by the City were not material to plaintiff's claims and improperly used vague and general terms like "mismanaged" and "inappropriate." The primary "factual" dispute identified by plaintiff in his statement of facts and argument involved the proper interpretation of the personnel policies — the actual terms of which are not in dispute. Our account of the facts construes the record in the light most favorable to the plaintiff, but accepts the City's statements of fact and supporting evidence where plaintiff has not specifically contradicted the City's evidence with contrary evidence of his own. V.R.C.P. 56(e) (explaining that when a party fails to address the other party's assertion of fact court may consider it undisputed for purposes of the motion).

left the Department, Gross was in the process of preparing a plan to reorganize the Department. Cate believed that, from his new position in City Hall, Pacy was doing things to undermine Wayne Gross's reorganization effort.

¶ 3. In January 2008, after Pacy left, plaintiff moved into Pacy's former office. At that time, he turned on the computer formerly used by Pacy and gained access to Pacy's email by, according to plaintiff, correctly guessing Pacy's password. Over the ensuing months, plaintiff accessed Pacy's email account in this way approximately six times. Plaintiff also began accessing the email account of department employee and plaintiff's coworker William Rasch, who was the union shop steward, after plaintiff discovered the account was not password protected. He accessed Rasch's account without authorization approximately eight times. Plaintiff printed emails from these accounts and shared them with Gross, but plaintiff lied about how he got them, telling his supervisor that he found the emails sitting on the office printer. On June 19, 2008, upon learning that plaintiff had apparently accessed other employees' email accounts, the City's human resources department placed plaintiff on paid administrative leave while it investigated further. During the ensuing investigation of plaintiff's accessing others' emails, plaintiff, who said he did so at the direction of his immediate supervisor, initially lied and told the investigator that he found the emails left on the printer.

¶ 4. In the meantime, immediately after plaintiff was informed that he was being investigated and placed on paid administrative leave, he telephoned two coworkers under his supervision at the Boathouse. He instructed one employee to remove approximately $2500 in cash from the safe and another employee to hide a City laptop that he had been using. The employees reported these requests to management who in turn reported the matter to the Burlington Police Department, which began investigating a possible embezzlement at the Boathouse. Ultimately, the police determined that all money was accounted for and closed the investigation.

¶ 5. After law enforcement finished its investigation, the City hired an investigator to do an independent investigation concerning plaintiff's management of the Boathouse. The City placed plaintiff on further indefinite administrative leave pending that investigation. The investigator ultimately concluded that plaintiff had misused his City computer and had mismanaged Boathouse finances.

¶ 6. On September 22, 2008, the City sent plaintiff a letter indicating that it was considering serious discipline, including the possibility of termination, on several bases. Among other things, the City concluded that plaintiff had repeatedly gained unauthorized access to other employees' email accounts, had lied to both his supervisors and investigators about how he got the emails in question, was insubordinate when he called Boathouse employees immediately after he was put on administrative leave and told not to attempt to influence the investigation, misappropriated the City's laptop for personal use, accessed pornography on the City's laptop, and used irregular accounting procedures. The City subsequently terminated plaintiff by letter in October 2008.

¶ 7. Plaintiff appealed that decision to the Parks and Recreation Commission pursuant to procedures outlined in the employee manual. In November 2008, after a hearing, the Commission concluded that the City had not met its burden with respect to its claims that plaintiff had been dishonest with his supervisors, had been insubordinate, had appropriated City property for personal use, and had practiced irregular accounting procedures. However, the Commission concluded that the City had met its burden of demonstrating that plaintiff committed misconduct by accessing coworkers' emails without authorization, lying to investigators, and making improper requests of two employees supervised by him. It found that plaintiff's misconduct deserved sanction, but not termination. The Commission placed plaintiff on an unpaid thirty-day suspension and a six-month probation period following suspension. Plaintiff did not appeal this decision.

¶ 8. Plaintiff served his suspension and returned to work on probationary status. Four months into his probation, a Boathouse employee complained that plaintiff had repeatedly harassed him by calling him names. After investigating the complaint, the City fired plaintiff in April 2009. As a probationary employee, plaintiff had no right to appeal his dismissal.

¶ 9. In March 2010, plaintiff filed suit against the City, alleging that the City breached its employment contract with him by placing him on paid administrative leave and for disciplining him for viewing other employees' emails because he claimed that this behavior was not proscribed by the personnel manual. He also claimed that the City's actions toward him, including its institution of a criminal investigation, were politically motivated and amounted to intentional infliction of emotional distress. Plaintiff

alleged that the City knew there was no merit to the allegations of financial impropriety and initiated the investigation based solely on political motives.[2] Plaintiff sought compensatory and punitive damages.

¶ 10. The City moved for summary judgment. Plaintiff opposed this motion and cross-moved for partial summary judgment. In May 2012, the court granted the City's request. The court concluded that plaintiff had failed to establish a genuine issue of material fact with respect to the question of whether the City breached the employment contract by placing plaintiff on paid administrative leave, and that the personnel manual unambiguously proscribed plaintiff's action of viewing other employees' emails without authorization. The court further concluded that plaintiff had failed to proffer evidence of any outrageous behavior by the City in support of his IIED claim. Plaintiff filed a timely notice of appeal.

¶ 11. On appeal from a decision granting summary judgment, this Court applies the same standard as the trial court. *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 28, 742 A.2d 734, 736 (1999). Summary judgment will be granted where the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a); *White*, 170 Vt. at 25, 742 A.2d at 736. The moving party must support its factual assertions with a concise statement of undisputed facts with citations to particular materials in the record. V.R.C.P. 56(c)(1)(A). A party opposing summary judgment may not rest on allegations or denials, but must demonstrate, with citations to the record, that a fact is genuinely disputed. *Id.*; *White*, 170 Vt. at 25, 742 A.2d at 736.

I.

¶ 12. We begin with plaintiff's breach-of-contract claim. We note at the outset that the parties' presentation of the breach-of-contract case raises questions not expressly addressed by the parties, and frames our analysis on review in a way that may not be generally applicable to other similar cases. Plaintiff does not challenge his actual termination, and concedes that, given his probationary status at that time, his termination for using inap-

---

[2] Plaintiff's complaint also included a claim for violation of public policy, but plaintiff later withdrew this claim.

propriate language with a subordinate was supportable. Although plaintiff argues that he was subjected to a "cascade of punitive measures" for conduct that he says did not violate any provision in the personnel manual, the only action of the City concerning his employment status that he expressly challenges is its decision to place him on paid administrative leave during its investigation — a decision that does not connect up in the causal chain with his ultimate termination, and which thus resulted in no lost wages to him. See *Herrera v. Union No. 39 Sch. Dist.*, 2006 VT 83, ¶ 26, 181 Vt. 198, 917 A.2d 923 (explaining that public employee suffers no deprivation of interest where he receives economic benefits of employment).

¶ 13. Plaintiff's arguments implicate the Commission's unappealed order overriding the City's initial termination of him and imposing a period of probation instead, but plaintiff does not expressly challenge that order even though it set the stage for his ultimate termination for speaking inappropriately to a subordinate while on probation. To the extent that his breach-of-contract claim is essentially a collateral challenge to the Commission's decision to put him on probation, his claim may be barred on the basis of collateral estoppel. See *Delozier v. State*, 160 Vt. 426, 429, 631 A.2d 228, 229-30 (1993) (explaining that administrative adjudicatory decisions rendered in processes incorporating essential elements of adjudication have res judicata effect and citing Restatement (Second) of Judgments § 83 (1982)). We need not and do not reach the question of whether plaintiff's breach-of-contract claim seeks an impermissible "second bite at the apple," because the City does not make an estoppel argument, and has instead responded to plaintiff's challenges on their merits. Accordingly, we address the issues as framed by the parties — accepting for the purposes of this appeal the premise that plaintiff can make a breach-of-contract claim challenging the merits of the Commission's decision to discipline him by putting him on probation.

¶ 14. Both sides litigated this case pursuant to the general principle that through written policies or practices an employer may bind itself to discipline employees, including termination, only for specified reasons and pursuant to specific procedures. *Dillon v. Champion Jogbra, Inc.*, 175 Vt. 1, 5, 819 A.2d 703, 707 (2002). In this case, both parties rely on the City's personnel manual as the source of the written policies or practices binding the City. Plaintiff argues that the City breached the requirements of its

personnel manual in two ways. First, the City disciplined him for accessing the email accounts of two coworkers even though, plaintiff argues, the personnel manual did not explicitly prohibit viewing other coworkers' emails. Second, the City placed him on paid administrative leave even though the personnel manual does not list any such status.

## A.

¶ 15. With respect to his viewing coworkers' email accounts, plaintiff does not dispute the City's characterization of his conduct in any material way; the "genuine issue of fact" relied upon by plaintiff is really the parties' divergent interpretations of the personnel manual. This is not, however, a factual determination. The manual says what it says. In interpreting the language of the employment contract, we are guided by general contract principles. See *John A. Russell Corp. v. Bohlig*, 170 Vt. 12, 16, 739 A.2d 1212, 1216 (1999) (applying contract principles to interpretation of employment contract). Ordinarily, the interpretation of a contract is a question of law. *Dep't of Corr. v. Matrix Health Sys., P.C.*, 2008 VT 32, ¶ 11, 183 Vt. 348, 950 A.2d 1201. If, however, the meaning of a contract is ambiguous the issue then becomes a mixed question of law and fact and summary judgment may not be appropriate. See *id.* (explaining that where parties' agreement is ambiguous, material fact remains in dispute and summary judgment is inappropriate).

¶ 16. Plaintiff argues that he can only be disciplined for conduct expressly proscribed in the personnel manual, and that the manual does not expressly prohibit employees from accessing other employees' email accounts. He asserts that the manual contains only generalized statements regarding employee conduct, and these statements are insufficient to create a prohibition against such behavior. In support, he cites several cases holding that statements of general policy do not create a binding employment contract. See, e.g., *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 20, 665 A.2d 580, 584 (1995) ("General statements of policy will not meet the requirements of a unilateral contract.").

¶ 17. Plaintiff's reliance on these cases is misplaced. They concern whether an employer through manuals or policy statements creates an enforceable binding employment contract in the first place. See *id.* (explaining that employer binds itself to

particular employment terms where policy is in definitive form and communicated to employees and employer manifests intent to comply with policies). As we explained in *Ross*, an employer does not bind itself to act in a particular way if it merely expresses vague goals or values; it must include sufficiently definite terms to be bound by those policies. *Id.* Here, there is no question that the City was bound by the terms of the personnel manual. The relevant question is what do the terms of the manual require?

¶ 18. We need not consider whether the personnel manual's more general exhortations to good behavior would support the City's disciplining of plaintiff for accessing others' email accounts; the personnel manual in this case specifically, clearly and unambiguously proscribes such conduct. Section 12.7(d),[3] entitled "Computer System," provides in relevant part:

> 2) The computer system is provided to City employees in order to conduct official City business. Occasional, brief, and appropriate personal use that does not interfere with City business or employees' duties is permitted consistent with compliance with this policy. *Examples of inappropriate and prohibited personal use include but are not limited to the following*: game playing or gambling; administering, promoting, advertising or soliciting commercial businesses or activities; *accessing or attempting to gain unauthorized access to internal or external sources by hacking or any unauthorized method*; chain letters or communications. The group e-mail and all-user e-mail system shall be used only for the transmission of official City Business. The transmission of harassing,

---

[3] Plaintiff contends that the City is barred from relying on § 12.7 because the City did not cite this particular section number in the body of its original motion for summary judgment, but included it in its response to plaintiff's cross-motion for summary judgment. In support, plaintiff cites cases stating that this Court will not reach arguments raised for the first time in a reply brief. See *In re Wal*Mart Stores, Inc.*, 167 Vt. 75, 86, 702 A.2d 397, 404 (1997). We disagree. The City did not fail to raise the issue in its initial summary judgment motion. Although the City did not list the specific section number in its motion, it did cite the specific section of the manual in its letter placing plaintiff on paid administrative leave, the City's letter notifying plaintiff of possible dismissal, and the Commission's decision, all of which were cited in and attached as exhibits in support of the City's motion for summary judgment. Even before plaintiff filed suit, plaintiff had ample notice that the City relied in part on § 12.7 in disciplining him.

embarrassing, indecent, profane, pornographic, obscene or unlawful materials or accessing sites containing such information is expressly prohibited. . . .

3) Employees have no right or expectation of privacy regarding anything created, sent or received on the City computer system including e-mail, sites accessed on the Internet or WWW, or any other use of computer equipment. The City may monitor any and all computer transactions and communications in order to evaluate the use of the City's computer system and to ensure compliance with this policy. All files and documents created on the City computer systems shall be considered City property. All computer communications are subject to public disclosure laws.

(Emphasis added.)

¶ 19. This section unambiguously prohibits employees from "accessing" other employees' emails by "any unauthorized method." Plaintiff did just that. He does not dispute that he accessed other employees' emails, and does not contend that he received authorization to do so.

¶ 20. Plaintiff maintains that § 12.7(d) is not sufficiently clear to put him on notice that his behavior was prohibited. He contends that the City could have explicitly stated "Viewing coworkers' email accounts is prohibited," but chose not to do so. There is, however, no question that a reasonable person could only understand § 12.7(d) to prohibit one employee from secretly viewing the email account of another employee. See *In re Towle*, 164 Vt. 145, 150, 665 A.2d 55, 60 (1995) (explaining that there is objective standard for determining whether employee had notice that conduct was prohibited).

¶ 21. Plaintiff further argues that because § 12.7(d) warns employees that there is no expectation of privacy in the content of their emails, he did not do anything improper by accessing others' accounts. We disagree. The manual's caution that employees should not expect that their emails are private does not open the door for anyone to access any employee's email without specific authorization, or for one employee to secretly view the emails of another. Instead, it puts all employees on notice that their employer, the City, may monitor the content of their emails and that the emails may be subject to public records requests. The

undisputed facts show that plaintiff was neither acting on behalf of the City when he accessed the accounts, nor was he doing so in response to a public records request.

¶ 22. Plaintiff also argues that his actions were not proscribed by § 12.7(d) because he did not actually "hack" into the accounts. The question of whether plaintiff's behavior amounted to "hacking" is not determinative of whether plaintiff violated § 12.7(d) in accessing the email accounts of other employees without their permission. Section 12.7(d) states that an inappropriate use includes accessing sources by "hacking *or* any unauthorized method." (Emphasis added.) The choice is disjunctive, and here plaintiff's access was undisputedly unauthorized. Plaintiff did not have Pacy's or Rasch's permission to access their email accounts. He also was not instructed to access the accounts by a superior, and review of others' email accounts was not within the scope of his job responsibilities.

¶ 23. Plaintiff argues that he did not act for personal reasons, but for work-related justifications. He portrays himself as a whistleblower and describes his conduct in accessing the accounts as "official business" because he was trying to help in the restructuring of his department by calling attention to what he believed to be improper interference from outside the department. Whatever plaintiff's subjective motivation, plaintiff has not provided any evidence that suggests that his actions were "official City business." As noted above, neither his job description nor directions from supervisors suggested that he was authorized to access others' accounts. In fact, when asked by his superiors how he obtained the emails, he lied about their origin. Because the access was not for official business and was accomplished using an unauthorized method, it was prohibited by § 12.7(d).

## B.

¶ 24. Plaintiff next argues that the City violated the employment contract by placing him on paid administrative leave during its investigation. According to plaintiff, this decision violated the employment contract because paid administrative leave is not among the disciplinary measures included in the personnel manual.

¶ 25. Other courts have held that placement of an employee on administrative leave during a period of investigation is not a

disciplinary or adverse-employment action. See, e.g., *Joseph v. Leavitt*, 465 F.3d 87, 90-91 (2d Cir. 2006) (holding that employee does not suffer adverse employment action when placed on paid administrative leave pending investigation and citing cases). This Court has likewise held that, although public employees may have a property interest in their jobs, which is protected by due process, that interest is limited to the pay and benefits associated with the job, and is not implicated by placing the employee on paid administrative leave. See *Herrera*, 2006 VT 83, ¶ 26 (principal's property interest in his job "extends only as far as the economic benefits that flow from his employment," and "[a] public employee does not have any right to actually hold a position and execute the duties of the office" (quotation and alteration omitted)).

¶ 26. In this case, even assuming for the purposes of this appeal that plaintiff can predicate a breach-of-contract claim on the City's decision to put him on paid administrative leave, and even assuming that putting someone on paid leave during an investigation could be characterized as "discipline," we conclude that nothing in the manual can be construed to limit the City's ability to place an employee on temporary paid administrative leave pending an investigation. As the trial court noted, the manual includes an expressly nonexhaustive list of disciplinary measures available to the City including warnings, reprimands, suspension, demotion and dismissal. This list describes the scope and kinds of tools available to the City; given the breadth of the list, its nonexhaustive character, and the fact that suspension without pay is among the employment actions authorized, plaintiff cannot reasonably argue that the contract should be interpreted to preclude the City from providing paid administrative leave — essentially suspension *with* pay.

¶ 27. For the above reasons, we affirm the superior court's summary judgment in favor of the City on plaintiff's breach-of-contract claims.

## II.

¶ 28. We turn to plaintiff's claim for intentional infliction of emotional distress. To avoid summary judgment on a claim for IIED, plaintiff must show that the City "engaged in outrageous conduct, done intentionally or with reckless disregard of the

probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395, 848 A.2d 344 (quotation omitted). This is a heavy burden that requires plaintiff to show that the City's conduct "was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Id.* (quotation omitted). The standard for outrageousness is objective. *Id.* ¶ 15. Therefore, an employer's conduct must be assessed with an objective standard based on the employer's actions and words, not on what the employee personally believed motivated the employer's conduct. See *Baldwin v. Upper Valley Servs., Inc.*, 162 Vt. 51, 57, 644 A.2d 316, 319 (1994) (holding that standard for IIED is objective and there was no outrageous conduct where plaintiff simply made vague assertions about employer's motives for his dismissal).

¶ 29. Plaintiff's complaint and motion for summary judgment asserted that the City was motivated by politics in sparking a criminal investigation against plaintiff, and that the City's actions tarnished plaintiff's reputation and caused him distress.

¶ 30. Plaintiff argues that employees are entitled to special IIED protection against insult and discrimination from an employer, citing *Alcorn v. Anbro Eng'g, Inc.*, 468 P.2d 216, 218 n.2 (Cal. 1970). Although we have not addressed this question directly, this Court's IIED cases include several between employees and employers and, like other states, we have not employed a stricter approach to IIED claims for actions arising in the workplace. See *Fromson*, 2004 VT 29, ¶ 14 (applying traditional IIED standard to claim of workplace IIED); accord *Baldwin*, 162 Vt. at 55, 644 A.2d at 318; *Denton v. Chittenden Bank*, 163 Vt. 62, 66, 655 A.2d 703, 706 (1994); *Gallipo v. City of Rutland*, 163 Vt. 83, 94, 656 A.2d 635, 643 (1994); see also *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex. 1999) (citing cases).

¶ 31. In any event, even under plaintiff's proposed standard, plaintiff failed to provide any evidence to support his allegation of outrageous conduct. Merely disciplining an employee is insufficient to support an IIED claim; an employee must demonstrate that "the manner of termination evinces circumstances of oppressive conduct and abuse of a position of authority vis-à-vis plaintiff."

*Crump v. P & C Food Mkts., Inc.*, 154 Vt. 284, 296, 576 A.2d 441, 448 (1990). In *Crump,* this Court concluded that the plaintiff had produced sufficient evidence for his claim to go to the jury where his employer "summoned plaintiff to a lengthy meeting without notice, continued the meeting without a break for rest or food, repeatedly badgered him to amend and sign a statement," the plaintiff did not feel free to leave, and immediately afterwards the plaintiff was dismissed. *Id.* at 296-97, 576 A.2d at 449.

¶ 32. Here, plaintiff has failed to provide evidence of conduct by the City that could be construed by a reasonable person as outrageous. Plaintiff claims that the City acted with improper motives in investigating and disciplining him, particularly in referring financial concerns to the police when, according to plaintiff, the City was aware there was a history of informal accounting practices at the Boathouse. Knowingly initiating an unfounded criminal investigation of someone for political motives may well rise to the level of IIED, but plaintiff fails to provide any evidence beyond his general allegations that that is what happened here. He does not dispute that immediately after he was notified that he was being placed on administrative leave and was told not to "attempt to influence" the ongoing investigation, plaintiff contacted two subordinates at the Boathouse and re-quested that they hide a laptop and remove cash from a safe. The City's reaction in referring the matter to police was not unrea-sonable given these objective facts, and plaintiff offers nothing more than conclusory allegations to support his claim.

¶ 33. In contrast to the employer in *Crump,* the City here conducted its investigation without "oppressive conduct" or "abuse of a position of authority." *Id.* at 296, 576 A.2d at 448. Plaintiff was placed on paid leave while an independent investigation was completed. Plaintiff had notice of the allegations against him, a full opportunity to participate in the investigation, and the right to appeal from the initial termination decision and present his case at a hearing. Plaintiff has not presented any evidence that creates a genuine issue of fact as to whether defendant engaged in conduct that was so outrageous as to surpass " 'all possible bounds of decency.' " *Dalmer v. State*, 174 Vt. 157, 171, 811 A.2d 1214, 1227 (2002) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Accordingly, we affirm the court's decision granting summary judgment to the City on plaintiff's claim for IIED.

*Affirmed.*