*Lewis v. Northfield Savings Bank*, No. 295-5-19 Wncv (Tomasi, J., Jan. 16, 2020).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## VERMONT SUPERIOR COURT

| | |
|---|---|
| SUPERIOR COURT<br>Washington Unit | CIVIL DIVISION<br>Docket No. 295-5-19 Wncv |

| | |
|---|---|
| Aaron Lewis<br>  Plaintiff<br><br>v.<br><br>Northfield Savings Bank, et al.<br>  Defendants | |

<u>Opinion and Order on Motions to Dismiss</u>

Plaintiff Aaron Lewis's employment as an information technology (IT) system administrator at Defendant Northfield Savings Bank ("NSB") was terminated following an investigation and a report by Defendant Rendition Infosec, LLC, which included conclusions to the effect that Mr. Lewis had pursued his own interests in "crypto-mining" using NSB's computers while at work.  Mr. Lewis claims that he did not operate his private crypto-mining business at work, that his visits to crypto-mining websites while at work were harmless, that they were consistent with the permitted internet activities of other employees, and that the real reason for his termination was that he refused to comply with his supervisor's instructions to ignore security risks and IT vulnerabilities with NSB's IT system.  Plaintiff also alleges that his employment was terminated in bad faith so that NSB could avoid paying him an annual bonus.

Mr. Lewis claims against NSB and three of its agents, Defendants Donna Austin-Hawley, Richard Nelson, and Timothy Sargent, that his discharge was wrongful because: (count 1) it violated modifications to his at-will employment; (count 2) he rightfully relied on certain policies in the employment handbook which NSB violated (promissory estoppel); (count 3) it violated the duty of good faith and fair dealing; and (count 4) it violated public policy. He claims that the NSB defendants are liable for (count 5) defamation insofar as they promoted falsehoods in the Rendition report about Mr. Lewis's crypto-mining activity. He claims that Defendants Austin-Hawley, Nelson, and Sargent similarly are liable for (count 6) interfering with his employment with NSB (intentional interference with contract). He claims that all NSB defendants are liable for (count 7) intentional infliction of emotional distress (IIED) for the course of events leading to his termination.

Mr. Lewis further claims that Rendition and one of its agents, Defendant Mark Pavelchak, are liable for defamation, interference with contract, and IIED to the extent that they participated in fostering the falsehood that Mr. Lewis conducted any significant crypto-mining activity while at work at NSB.

Three motions to dismiss are pending. In one, the NSB defendants argue that the pleadings are insufficient to state any claims against them. Vt. R. Civ. P. 12(b)(6). In separate Rule 12(b)(2) motions, Rendition and Mr. Pavelchak argue

2

that the Court lacks specific personal jurisdiction over them.[1]  Rendition and Mr.

Pavelchak do not otherwise address the substance of the claims against them.

I.  <u>Basic allegations of the complaint</u>

Mr. Lewis alleges as follows in the complaint.  He was hired by NSB as an IT

system administrator in 2016.  When he started, he was given a copy of the 2016

Employee Handbook and he became aware of its terms.

Soon thereafter, Ms. Austin-Hawley told him that she expected he would

have a long career at Northfield.  In November 2017, she told him that he was

nominated to participate in the NSB Institute for the Class of 2018, a program for

employees with bright futures at NSB.  Mr. Lewis began participating in the

program's monthly meetings.  At one of them, NSB's president identified him as a

likely department head in the future.

In April 2018, he became responsible for identifying and remediating certain

IT risks and vulnerabilities.  He determined that some real risks had been marked

acceptable or as false positives by others in the past.  Mr. Nelson, his supervisor,

instructed him to ignore those problems and mark them acceptable.  Mr. Lewis

refused to do so and, instead, proposed ways of solving those problems responsibly.

The risks he identified posed a threat to customers' financial information.  He never

got responses to his proposals.

---

[1] In their motions, Rendition and Mr. Pavelchak each argue that the court lacks both general and specific personal jurisdiction over them.  However, there is no arguable basis for general jurisdiction in this case, and Mr. Lewis has disclaimed any assertion of general jurisdiction in briefing.  It is unnecessary to address general jurisdiction further.

In July 2018, Mr. Lewis downloaded crypto-mining software to his home computer and began his own private crypto-mining operation through a crypto-mining website. He occasionally visited that website while at work, on work computers, solely to monitor the status of his home operation. Doing so did not present any security risks to NSB greater than visiting an ordinary private e-mail website, which employees were permitted to do on NSB computers.

In October 2018, NSB computers flagged that Mr. Lewis was running crypto-mining software on his work computer and that this presented a security risk. Mr. Lewis was placed on paid leave pending an investigation. Third-party Rendition was hired to conduct a forensic investigation. Its agent, Mr. Pavelchak, was primarily responsible for the investigation and resulting report, which included findings, express or implied, that Mr. Lewis had been operating his home crypto-mining operation from work, and that this presented possible security threats.

Following receipt of the report, Ms. Austin-Hawley notified Mr. Lewis that his employment was being terminated because "(a) he had used his work station to manage his personal crypto-miners by visiting a website, (b) he had spent time to check the website, (3) he had used workstation resources to view the website and, (4) he was being terminated for conducting business which could be used for personal gain." Complaint at 11. Mr. Lewis objected to all these assertions to no avail and his employment was terminated. In a report to the Vermont Department of Labor, NSB characterized the reason for Mr. Lewis's termination as "misuse of technical resources." Complaint at 12.

4

Mr. Lewis alleges that NSB permitted employees to access the internet, including e-mail and personal banking websites, without being disciplined, and he is aware of one other employee who accessed a crypto-mining website without being disciplined. The inference from his allegations is that his conduct was not different in kind or degree from that knowingly permitted and sanctioned by NSB in connection with other workers. He alleges that he was terminated on ginned-up grounds in retaliation for suggesting necessary IT security improvements that his supervisors preferred to ignore and to avoid paying him an annual bonus.

Mr. Lewis subsequently found new employment with a different employer. But, he maintains that he is over-qualified for his new position, it does not pay as much as his NSB job, and it requires a far longer commute.

II. Claims Against NSB defendants

A. Standard

The Vermont Supreme Court has described the familiar standard for Rule 12(b)(6) motions to dismiss for failure to state a claim as follows:

> "A motion to dismiss . . . is not favored and rarely granted." This is especially true "when the asserted theory of liability is novel or extreme," as such cases "should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations." In reviewing a motion to dismiss, we consider whether, taking all of the nonmoving party's factual allegations as true, "'it appears beyond doubt' that there exist no facts or circumstances that would entitle the plaintiff to relief." We treat all reasonable inferences from the complaint as true, and we assume that the movant's contravening assertions are false.

*Alger v. Dep't of Labor & Indus.*, 2006 VT 115, ¶ 12, 181 Vt. 309, 316–17 (citations omitted); *accord Bock v. Gold*, 2008 VT 81, ¶ 4, 184 Vt. 575, 576 (dismissal "proper

5

only when it is beyond doubt that there exist no facts or circumstances, consistent with the complaint that would entitle the plaintiff to relief").

B.  Breach of Terms of Employment Relationship (Counts 1–2)

Mr. Lewis claims that his employment was terminated in violation of the terms of his employment agreement with NSB.  He does not allege any contract for a particular term of employment.  Rather, he claims that NSB limited its ability to terminate his employment by operation of the terms of the 2016 employee handbook and in the context of comments from NSB officials implying that he was well positioned to have a long career at NSB.[2]  NSB argues that the pleadings fail to describe any actionable claim that the handbook or any statements by NSB officials or NSB's personnel practices deviated from ordinary at-will employment, and that the duty of good faith and fair dealing has no application in these circumstances.

In Vermont, "[i]t is the generally accepted [presumption] that an employment contract for an indefinite term is an 'at will' agreement, terminable at any time, for any reason or for none at all." *Sherman v. Rutland Hosp., Inc.*, 146 Vt. 204, 207 (1985).  Through their policies and practices, however, employers may limit their ability to terminate an employee's employment.  This may be done notwithstanding

---

[2] Mr. Lewis relies extensively on the 2016 handbook in his complaint, though it is not attached to the complaint.  Because Mr. Lewis effectively incorporated it into the complaint, the NSB defendants attached it to their motion to dismiss and have properly relied on it in support of dismissal.  *See Kaplan v. Morgan Stanley & Co.*, 2009 VT 78, ¶ 10 n.4, 186 Vt. 605, 609 n.4.

the employer's claim that employment is at-will by policies or practices directly addressing discipline or termination of employment, which may address the manner of termination or limit it to circumstances of just cause. *See, e.g., Benoir v. Ethan Allen, Inc.*, 147 Vt. 268, 271 (1986) ("In short, the handbook, by clear implication, foreclosed defendant's right to terminate without cause."). "Similarly, promissory estoppel may modify an at-will employment relationship" in specific circumstances, while the agreement otherwise remains at-will generally, "and provide a remedy for wrongful discharge." *Foote v. Simmonds Precision Products Co., Inc.*, 158 Vt. 566, 571 (1992); *see also Dillon v. Champion Jogbra, Inc.*, 175 Vt. 1, 9 (2002).

Employer policies that modify at-will employment need not be written down—modifications may be proven by evidence of personnel practices. "A proffered procedure or practice may be enforceable, if it is clearly established and uniformly and consistently applied throughout the company. An employer's official statement does not have to be in writing in order to be enforceable. Requiring such a formality, in this context, would favor form over substance." *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 20 (1995). The issue is not whether the policy or practice is written down, but whether it rises to the level of an enforceable modification of the at-will relationship.

Mr. Lewis does not claim that his at-will employment had become subject to any generally applicable just cause limitation, and he is not claiming any failure to comply with a particular progressive discipline policy. No progressive discipline

7

policy is alleged.  Consistent with the common law presumption, the manual clearly

emphasizes that employment is at-will:

> The policies and procedures presented in this Employee Handbook, the Benefits Handbook, the NSB Code of Conduct and Ethics, and any other Bank policy documents are not intended to create and should not be construed to constitute a contract of employment with NSB.  NSB is an at-will employer and employment is for no definite period.  Either the employer or NSB may terminate employment for any reason, at any time, with or without cause or notice.  No representative or agent of NSB has the authority to enter into any oral or written agreement with you that changes this at-will relationship or promises employment or benefits for any specified period of time, unless it is in writing in a document signed by the President/CEO or designee.

2016 Handbook at 7.  There are no progressive disciplinary provisions or other

terms in the handbook that might imply any just cause or other general limitation

on employment termination.

Instead, Mr. Lewis alleges that he relied on the following specific provisions

in the 2016 employee handbook and that his employment was terminated in

violation of them:

> Management strives to maintain sound employee relations with open channels of communications.  Your immediate supervisor, department management, and Human Resources are available to answer any questions.  Employees are encouraged to ask questions and to make suggestions for improvement.

2016 Handbook at 8, Complaint at 4.

> Access to the Internet should be used in a responsible manner by NSB employees.  Employees who have personal e-mail accounts with third party vendors (e.g., Gmail, Yahoo, AOL, etc.), who use NSB equipment or the NSB network to access their account, are advised that NSB has the right to monitor or inspect such usage.  All internet activity will be monitored by Information Systems.  Evidence of usage issues and abuses will be reported to the VP Information Technology or Sr. Vice

President & Chief Human Resources Officer to be shared with the appropriate department manager.

Downloading and installing software programs from the Internet is not allowed without prior approval from the VP Information Technology. If there is a business need for software applications not currently provided by NSB, please consult Information Systems.

2016 Handbook at 13, Complaint at 4–5.

Only NSB owned and/or licensed software will be installed on NSB systems by I.S. .... I.S. will be involved in all software acquisitions to ensure technical and strategic fit with NSB's technical architecture and to provide technical consultation and support for business areas.

2016 Handbook at 13, Complaint at 5.

Social media platforms shall not be accessed on bank owned computers while you are working, unless required for business use. . . . NSB reserves the right to block network access to any website at management's discretion.

2016 Handbook at 14, Complaint at 5.

Employees who publish or disclose information that violates this or other NSB policies (including NSB's Code of Conduct and Ethics), or federal and/or State laws, will face disciplinary action up to and including termination of employment.

2016 Handbook at 15, Complaint at 5.

According to Mr. Lewis, these provisions encourage employees to make suggestions for improvement and permit employees to use work computers to access the internet responsibly for private purposes. Mr. Lewis additionally asserts that, as a matter of practice, NSB consistently permitted employees to access e-mail websites and private banking websites while at work, and he is aware that one employee accessed a crypto-mining website, all without discipline or termination. These policies and practices, therefore, he argues, imply that an employee cannot be

9

terminated for making suggestions for improvement or accessing the internet responsibly, which is how he characterizes his conduct. Under Vermont law, this is best characterized as a claim of modification of the at-will employment relationship, whether arising out of unilateral contract principles or promissory estoppel, predicated on the specific policies and practices described above.[3]

The Vermont Supreme Court has described the sort of promise that is actionable in this context as follows: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Foote v. Simmonds Precision Products Co., Inc.*, 158 Vt. 566, 573 (1992) (quoting Restatement (Second) of Contracts § 90(1)). Such a promise must be evinced by "policies which are definitive in form, communicated to the employees, and demonstrate an objective manifestation of the employer's intent to bind itself." *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 20 (1995). "General statements of policy" are insufficient. *Id.* "The critical inquiry is . . . whether the procedure amounted to an enforceable promise of specific treatment in a specific circumstance." *Trombley v. Southwestern Vermont Medical Center*, 169 Vt. 386, 394 (1999) (*quoting Ross*, 164 Vt. at 22); *see also Cate*

---

[3] The law of Vermont in this area "draws on aspects of both unilateral contract formation and promissory estoppel." *Taylor v. National Life Ins. Co.*, 161 Vt. 457, 464 (1993); *see also* Restatement of Employment Law § 2.05 (explaining that traditional contract principles are a "conceptually awkward fit" in this context). Because Vermont law incorporates aspects of both and this area of the law has so developed, it is unhelpful and unnecessary to attempt to untangle unilateral contract principles from those of promissory estoppel as one might in other contexts.

*v. City of Burlington*, 2013 VT 64, ¶ 17, 194 Vt. 265, 273 ("[A]n employer does not bind itself to act in a particular way if it merely expresses vague goals or values; it must include sufficiently definite terms to be bound by those policies.").

The handbook policies Mr. Lewis points to, along with the "practices" he alleges, appear, at first blush, to fall into the type of "general statements" and practices that have been found to not alter the at-will relationship. Nonetheless, we remain at the motion to dismiss stage, where all inferences are weighed in favor of Plaintiff's claim. If the Court indulges such inferences, Plaintiff's claim is that his internet use was entirely consistent with that of other employees, that NSB had consistently approved of such private use at work, and had not sanctioned—much less terminated—employees for that type of conduct. He maintains that he relied on the employer's practice in that regard in deciding to undertake his internet use. These may not be the actual facts, and NSB may not have acted in the type of consistent and pervasive manner towards others' internet use as is suggested by Plaintiff. Plaintiff's allegations are sufficient, however, to raise such a possibility. On the present record, the Court cannot say there are no set of facts under which Plaintiff could recover on this claim. *Alger* 2006 VT 115, ¶ 12, 181 Vt. at 316–17.

Accordingly, the motion to dismiss is denied as to Counts I and II.

C. <u>Breach of the Covenant of Good Faith and Fair Dealing (Count 3)</u>

The covenant of good faith and fair dealing generally is implied in every contract to ensure that neither party does "anything to undermine or destroy the other's rights to receive the benefits of the agreement." *Carmichael v. Adirondack*

11

*Bottled Gas Corp. of Vermont*, 161 Vt. 200, 208 (1993). In the case of at-will employment contracts, however, the covenant generally does not apply.

> [I]mplying such a covenant [to an at-will employment contract] "would seem to subject each discharge to judicial incursions into the amorphous concept of bad faith." Therefore, we decline to recognize the implied covenant of good faith and fair dealing as means of recovery where the employment relationship is unmodified and at-will and the employee is challenging the dismissal based on a right to tenure.

*Ross*, 164 Vt. at 23; *see also Boynton v. ClearChoiceMD, MSO, LLC*, 2019 VT 49, ¶ 6 ("Because plaintiff was an at-will employee and she has admitted on appeal that the handbook does not modify her status as an at-will employee, her argument that defendants violated the covenant of good faith and fair dealing by terminating her for a pretextual reason fails."); *Madden v. Omega Optical, Inc.*, 165 Vt. 306, 313 (1996).

Further, a claim for violation of the covenant may not simply be duplicative of a an alleged breach of contract claim. *See Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000) (applying New York law).

The High Court has left undecided "whether we would recognize such a covenant in the context of nontenure terms of at-will employment contracts, such as accrued benefits." *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 23 (1995); *see also* Restatement of Employment Law § 2.07(c)(1) (noting that the covenant applies in at-will employment agreements to the extent of imposing a duty not to terminate to "prevent[] the vesting or accrual of an employee right or benefit").

12

In this case, Mr. Lewis alleges that NSB terminated his employment in bad faith to avoid paying him an annual bonus valued between $4,000 and $5,000. The NSB defendants are not entitled to dismissal as to Count III.

D. Violation of Public Policy (Count 4)

Mr. Lewis also claims that "NSB violated public policy when it terminated Plaintiff's employment as an IT System Administrator because he refused to follow a directive that would have further exposed NSB's computer system to cyber-attacks and placed the personally identifiable information and financial data of NSB customers at risk of being breached and stolen." Complaint at 20–21. He also argues that his termination was intended to cover up these security flaws, protect NSB's investors, and protect his supervisor.

"In Vermont, under an 'at will' employment contract, an employee may be discharged at any time with or without cause, 'unless there is a clear and compelling public policy against the reason advanced for the discharge.'" *Payne v. Rozendaal*, 147 Vt. 488, 491 (1986) (*quoting Jones v. Keogh*, 137 Vt. 562, 564 (1979)). Potential sources of such public policies include statutes, constitutions, decisional law, and professional codes. *Boynton v. ClearChoiceMD, MSO, LLC*, 2019 VT 49, ¶ 8; *see also LoPresti v. Rutland Regional Health Services, Inc.*, 177 Vt. 316, 326, 2004 VT 105, ¶ 20 (2004) (termination for refusing to violate state law and formal professional ethical code to the detriment of the public would satisfy the public policy exception); Restatement of Employment Law § 5.03. "The central

13

point is that the public policy be well established . . . so that courts have a firm basis for recognizing the cause of action and employers and employees are put on notice as to the scope of activity that public policy protects." Restatement of Employment Law § 5.03 cmt. a. "As a matter of law, . . . professional disagreements are insufficient to support a public policy claim." *Dulude v. Fletcher Allen Health Care, Inc.*, 174 Vt. 74, 82 (2002).

Mr. Lewis does not attempt to point to any well-established, clear and compelling public policy, professional ethical codes, or state statutes involved in the events leading to his termination. Rather, he simply asserts that he was instructed by his supervisor to ignore what he believed were security threats that needed to be mitigated, and that he refused to comply with his supervisor's instructions. He describes no more than a professional disagreement that, as a matter of law, is insufficient to support a public policy claim. It is immaterial that he believes and perhaps could prove that his judgment on the matter was better than his supervisor's. The public policy exception does not give the court unbridled authority to determine whose decision better benefitted the public or to override the employer's decision simply because it was founded on bad intentions. The exception is predicated on concrete obligations with a professional or similar basis of a sort not alleged here.

The NSB defendants are entitled to dismissal of this claim.

E. Defamation (Count 5)

14

Mr. Lewis claims that the suggestion in the Rendition report that he operated his home crypto-mining business from work was fundamentally false and defamatory.[4]  He claims defamation against the NSB defendants insofar as they received the report and transmitted it to others within NSB and insofar as NSB and its agents represented to the State Department of Labor that Mr. Lewis has been terminated for misusing technical resources.  Defamation consists of "(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages."  *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 291 (1990) (citation omitted).  The NSB defendants seek dismissal of this claim principally because, they argue, any communications *within* NSB are protected by a conditional privilege for intra-corporate communications and any communications to the Department of Labor are protected by statute.

With regard to communications internal to NSB, the NSB defendants rely on the "conditional privilege for intra-corporate communications to protect its legitimate business interests."  *Crump*, 154 Vt. at 292.  "A showing of malice, however, may defeat the conditional privilege."  *Lent v. Huntoon*, 143 Vt. 539, 549 (1983), cited in *Crump*, 154 Vt. at 292.  As the *Crump* Court explained:

> Under Vermont law, a plaintiff must show one of two types of malice in order to overcome the conditional privilege protecting legitimate business interests.  For the purposes of clarity in this discussion, we

---

[4] NSB disputes that the statement is false, but that is a matter that must be addressed on the evidence.

15

will use the following full-phrase definitions for each type: "knowledge of the statement's falsity or with reckless disregard of its truth," or "conduct manifesting personal ill will, reckless or wanton disregard of plaintiff's rights, or carried out under circumstances evidencing insult or oppression." The first type of malice may be inferred.

*Crump*, 154 Vt. at 293 (citations omitted). Mr. Lewis alleges that the NSB defendants published the defamatory statements about him with malice. More specifically, he alleges that they did so with knowledge of falsity or reckless disregard of truth and Mr. Lewis's rights and with ill will.

The NSB defendants argue that Mr. Lewis's allegations of malice should be disregarded as conclusory because he merely asserts malice generally and does not describe circumstances amounting to malice. "Conclusory allegations" typically are insufficient to support a claim for relief. *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (citation omitted), *cited in Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 10, 184 Vt 1, 9. Malice, however, is a condition of the mind, and the civil rules expressly allow plaintiffs to allege conditions of the mind generally. Vt. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally."); *see also Skaskiw v. Vermont Agency of Agriculture*, 2014 VT 133, ¶¶ 12–14, 198 Vt. 187 (2014) (noting that lack of even general allegation of malice counsels in favor of dismissal). "The concept behind this portion of Rule 9(b) is an understanding that any attempt to require specificity in pleading a condition of the human mind would be unworkable and undesirable." 5A Arthur R. Miller et al., Fed. Prac. & Proc. Civ. § 1301 (4th ed.). The NSB defendants are not entitled to dismissal on this basis.

16

The same analysis applies with regard to the statutory privilege regarding communications with the Department of Labor. The relevant provision of Vermont labor and employment code is as follows:

> All written, or oral reports, or other communications, from an employer or his or her workers to each other, or to the Commissioner or any of his or her agents, representatives, or employees, made in connection with the requirements and administration of this chapter or the regulations thereunder, shall be absolutely privileged and shall not be made the subject matter or basis for any suit for slander or libel in any court of this State, *unless they are false in fact and malicious in intent*.

21 V.S.A. § 1314(g) (emphasis added). Mr. Lewis alleges that the relevant statements are false in fact and malicious in intent. For the same reasons that the NSB defendants are not entitled to dismissal of the intra-corporate defamation claim, they also are not entitled to dismissal of this claim.

F. Intentional Interference With Contract (Count 6)

Mr. Lewis claims that, insofar as Defendants Austin-Hawley, Nelson, and Sargent knowingly or recklessly promoted and transmitted the defamatory statements in the Rendition report within NSB, leading to his dismissal, they are liable for intentional interference with his employment agreement with NSB. The NSB defendants argue that this claim can have no application to them because the communications at issue were published internally by NSB employees for NSB purposes only.

The essence of tortious interference is impeding "the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract." Restatement (Second) of Torts § 766.

17

"This tort provides protection even to contracts terminable at will." *Trepanier v. Getting Organized, Inc.*, 155 Vt. 259, 268 (1990). "While the elements are described by courts in various ways, under any definition of this tort, the interference with the contract or prospective advantage must come from a third party." *Stone v. Town of Irasburg*, 2014 VT 43, ¶ 66, 196 Vt. 356, 382. Employees generally are the agents of their employer and thus typically not third parties subject to such a claim involving interference with a contract with the employer. *Skaskiw v. Vermont Agency of Agric.*, 2014 VT 133, ¶ 25, 198 Vt. 187, 199.

Some courts have permitted such claims against employees, however, in limited circumstances. Typically, this occurs when the defendant-employee acted exclusively for the employee's own pecuniary gain or wholly outside the scope of employment. *See, e.g., Gruhlke v. Sioux Empire Federal Credit Union, Inc.*, 756 N.W.2d 399, 408 (S.D. 2008) ("In sum, when corporate officers act within the scope of employment, even if those actions are only partially motivated to serve their employer's interests, the officers are not third parties to a contract between the corporate employer and another in compliance with the requirements for the tort of intentional interference with contractual relations."). Courts approach the issue in various ways. *See generally* Annotation, Liability of Corporate Director, Officer, or Employee for Tortious Interference with Corporation's Contract with Another, 72 A.L.R.4th 492 (describing myriad formulations of the exception). Some courts allow the claim if the employee acted with "malice." But the focus is not malice simply; it is on whether the impropriety is significant enough to show that the defendant was

18

acting wholly outside the scope of employment or purely to serve the employee's interests. *See Furley Sales and Associates, Inc. v. North American Automotive Warehouse, Inc.*, 325 N.W.2d 20, 26 n.8 (Minn. 1982) (explaining that the question remains whether the actions of the employee can be "separated sensibly" from those of the employer); *see also Skaskiw,*, 2014 VT 133, ¶¶ 26–27.

The most recent treatment of this issue in the relevant Restatement explains as follows:

> This distinction most often becomes important when the plaintiff had a contract with a corporation and sues one of the corporation's employees for interfering with it. In a case of that kind, the plaintiff can make out a claim of interference only by pointing to acts taken outside the defendant's scope of employment. The plaintiff bears the burden of proof, and it generally must be discharged by proving that the defendant was motivated entirely by personal gain at the corporation's expense. Mixed motives will not suffice. *The bar is kept high because corporations can act only through their agents. It should not be easy for a party to turn a contract claim against a corporation into a tort claim by attacking those through whom the corporation carries out its business.*

Restatement (Third) of Torts: Liab. for Econ. Harm § 16 Tentative Draft No. 3 (March 7, 2018) (emphasis added).

"[T]he key factor [is] whether the defendants were acting outside the scope of their employment to further their own interests." *Murray v. St. Michael's College*, 164 Vt. 205, 213. The scope of employment generally refers to "performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." Restatement (Third) of Agency § 7.07; *see also*

19

Restatement (Second) of Agency § 236 (explaining that an agent may be acting within the scope of employment if serving the employer's purposes even if "at the same time accomplishing his own objects or those of a third person which conflict with those of the" employer).

Mr. Lewis alleges that the NSB defendants were motivated solely by ill will toward him in arranging for the forensic investigation of his computer use and for using the results of that investigation internally to facilitate his termination and make it appear as though it was based on his inappropriate computer use. He maintains that they hoped to avoid his criticisms of NSB's security measures, which Plaintiff believed were inadequate to protect NSB's customers. The complaint's allegations and inferences therefrom can be interpreted liberally to allege that the NSB defendants engaged in a concerted effort to oust him and did so purely to serve their own malicious motivations and not to serve any purposes of NSB within the scope of their employment. These allegations and inferences may have no basis in actual fact. But, at the motion to dismiss stage, they are sufficient to state a claim of tortious interference against NSB's own employees.

The individual Defendants are not entitled to dismissal of this Count.

G. <u>Intentional Infliction of Emotional Distress (Count 7)</u>

Mr. Lewis claims that the NSB defendants intentionally caused him emotional distress by soliciting an unnecessary investigation into his internet activity and knowingly promoting the ultimate third-party report that included falsities, culminating in his termination. IIED is described in the Restatement

20

(Second) of Torts as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." Restatement (Second) of Torts § 46(1); *see Sheltra v. Smith*, 136 Vt. 472, 475–76 (1978) (adopting Section 46 in Vermont).[5] The standard is high. "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community.'" *Denton v. Chittenden Bank*, 163 Vt. 62, 66 (1994) (quoting Restatement § 46 cmt. d). The result must be "extreme emotional distress." *Id*. A plaintiff cannot rely upon his perceptions of the defendant's motives to establish the tort—the test is objective. *See Fromson v. State*, 2004 VT 29, ¶¶ 15, 17, 176 Vt. 395, 401; *Baldwin v. Upper Valley Servs, Inc.*, 162 Vt. 51, 57 (1994).

---

[5] In numerous cases, courts condense the element of extreme and outrageous conduct to simply outrageous conduct. The third Restatement clarifies that these should be considered separate issues.

> The adjectives "extreme" and "outrageous" are used together in a fashion that might suggest that each merely emphasizes the other, rather than serving a distinct role. However, some conduct that may be outrageous—for example, marital infidelity—is sufficiently common that it could not be characterized as extreme (although today it may also not be outrageous). Similarly, some extreme conduct—climbing Mt. Everest, for example—is not outrageous. Thus, this double limitation, "extreme and outrageous," requires both that the character of the conduct be outrageous and that the conduct be sufficiently unusual to be extreme.

Restatement (Third) of Torts: Phys. & Emot. Harm § 45 cmt. d.

The Vermont Supreme Court explained in *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284 (1990), that the termination of employment itself does not give rise to an IIED claim, but "the manner of termination" may be so oppressive and abusive as to do so. *Id.* at 296.

In this case, again, indulging all potential inferences in Plaintiff's favor, the complaint suggests that the NSB defendants conspired to fire him because he had raised legitimate security concerns that his supervisors were choosing to ignore. To cover that fact and obtain some justification for firing Plaintiff (an otherwise model employee), the defendants relied on false findings obtained from a third-party investigation. They knew or recklessly ignored that those results were false yet relied on those determinations to fire Plaintiff unjustly.

Based on the liberal Rule 12(b)(6) standard, an objective factfinder might find such conduct to be extreme and outrageous.

The motion to dismiss the IIED claim is denied.

III. Personal Jurisdiction Over Rendition and Mr. Pavelchak

   A. Standard

A pretrial motion to dismiss for lack of personal jurisdiction calls upon the plaintiff to demonstrate a prima facie showing of jurisdiction, which the court may determine based on the pleadings and affidavits. *See Roman Catholic Diocese of Burlington, Inc. v. Paton Insulators, Inc.*, 146 Vt. 294, 296 (1985). The plaintiff's burden is "relatively slight." *Godino v. Cleanthes*, 163 Vt. 237, 239 (1995). "In assessing the submitted materials, the court eschews fact finding and simply

22

accepts 'properly supported proffers of evidence' as true and rules on the jurisdictional question as a matter of law." *Schwartz v. Frankenhoff*, 169 Vt. 287, 295 (1999).  Generally, the court will "take as true the allegations of the nonmoving party with regard to the jurisdictional issues and resolve all factual disputes in his or her favor."  5B Arthur R. Miller et al., Fed. Prac. & Proc. Civ. § 1351 (3d ed.).

B.  <u>Specific personal jurisdiction, generally</u>

"Vermont's long arm statute, 12 V.S.A. § 913(b), confers 'jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause.'" *Havill v. Woodstock Soapstone Co.*, 172 Vt. 625, 626 (2001) (citation omitted).  The Court has described the rudiments of due process limitations on personal jurisdiction as follows:

> The Due Process Clause "protects an individual's liberty interest in not being subject to the binding judgments" of a foreign state with which the individual has no meaningful contacts.  A state court may assert jurisdiction and comport with due process where a nonresident defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  The critical consideration in determining if defendants' activities satisfy the minimum contacts requirement is whether "the defendant's conduct and connection with the forum State are such that [the defendant] should reasonably anticipate being haled into court there."  This reasonableness requirement is met when the defendant purposefully directs activity toward residents of a forum state and the litigation arises out of, or relates to, that activity.  The reasonableness requirement also prevents a defendant from being subjected to jurisdiction on the basis of fortuitous, attenuated, or random contacts.

*Dall v. Kaylor*, 163 Vt. 274, 275–76 (1995) (citations omitted).

C.  <u>Personal Jurisdiction over Rendition</u>

23

While Mr. Lewis asserts in his complaint that NSB contracted directly with Rendition for its forensic services, Rendition's CEO, in a sworn affirmation, explains that Rendition is a third-party service provider engaged to perform the services at issue in this case by Presidio Networked Solutions, LLC (not a defendant).[6]  NSB contracted directly with Presidio, which has offices in Massachusetts.  Presidio subcontracted with Rendition.  Rendition is a Georgia limited liability company with a principal place of business in Georgia.  Rendition does not advertise its services in Vermont, generally conducts no business in Vermont, and it has never contracted directly with NSB.  Rendition was paid by Presidio for its services.  Presidio was paid by NSB.

Rendition sent an employee, Bruce Self, to Vermont to meet with NSB's network administrator and to collect data ("image two computer desktops") for analysis.  McCrillis Affirmation at 2 (filed Aug. 7, 2019).  The analysis was conducted, and the report was generated, by another Rendition employee, Mr. Pavelchak, from his home in Florida, where he works remotely.  *Id*. at 3.  When the

---

[6] Mr. Lewis has not come forward with any evidence to counter the McCrillis affirmation and related documentation of Rendition's relationship with Presidio and lack of direct business relationship with NSB, and he generally seeks an opportunity for discovery as to jurisdictional facts to the extent necessary.  For purposes of determining whether Mr. Lewis has made a prima facie showing, the court relies on Rendition's factual presentation, which has clear evidentiary support.  *See Professional Group Travel, Ltd. v. Professional Seminar Consultants, Inc.*, 483 N.E.2d 1291, 1295 (Ill. Ct. App. 1985) ("If a defendant's affidavit contesting jurisdiction is not refuted by a counter affidavit filed by the plaintiff, the facts alleged in the defendant's affidavit are accepted as true.").  Because those facts, in the context of the pleadings, demonstrate a prima facie showing of jurisdiction, there is no need to forestall a ruling to that effect pending discovery.

report was complete, Mr. Pavelchak sent it directly to Presidio and "end user" NSB, as Rendition's contract with Presidio required.

Mr. Lewis's claims against Rendition and Mr. Pavelchak—defamation, intentional interference with contract, and IIED—all arise directly out of allegedly defamatory statements that Mr. Pavelchak included in the forensic report that he supplied directly to NSB.

In its motion to dismiss, Rendition emphasizes the lack of commercial contacts it had with Vermont, or at least the minimal and indirect nature of them, and otherwise argues that the mere happenstance that harm, allegedly caused by its intentional conduct, was felt in Vermont is insufficient.

The jurisdictional issue in this case is best analyzed through consideration of the alleged tort. Rendition's *commercial* contacts with Vermont were minimal but largely beside the point. It is not Rendition's business relationship with NSB that is at issue in this case. It is the intentional tort alleged to have occurred in the context of Rendition's business, and resulting harm, that is at issue.

Rendition's argument that the mere fact that harm occurs in the forum state is insufficient to establish jurisdiction may be so, but it mischaracterizes the nature of its jurisdictional contacts with Vermont. Defamation "is generally held to occur wherever the offending material is circulated." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 777 (1984); *see also Fallang v. Hickey*, 532 N.E.2d 117, 119 (Ohio 1988) ("A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory. This is because torts involve wrongful

25

conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor shall be liable for damages which are the proximate result of his tort.") (citation omitted)).

In this case, the intentional tort was directed at Vermont and the resulting harm plainly occurred in Vermont. Rendition undertook to investigate the activities of a Vermont employee of a Vermont business, it sent an employee to Vermont to gather the raw data, it conducted its investigation and memorialized its findings and conclusions in a report, and it sent that report directly to the Vermont employer in Vermont. Those facts place this case close proximity to *Calder v. Jones*, 465 U.S. 783 (1984).

In *Calder*, the U.S. Supreme Court found the fact that libelous material was sent into the forum state and there caused harm wholly sufficient to establish personal jurisdiction in that state. *Id.* at 789. "The crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to [the forum state], not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort." *Walden v. Fiore*, 571 U.S. 277, 287 (2014).

The allegedly defamatory material in this case was in the Rendition report and it directly led to the harm alleged by Mr. Lewis. There was nothing random, fortuitous, or attenuated about Rendition's Vermont contacts. *Cf. Calder*, 465 U.S. at 789 (noting jurisdiction may not be appropriate for negligence that was "untargeted" to forum state). Rendition should not be surprised that NSB used the material that Rendition provided to it or that it has been haled into court in

Vermont in the ensuing litigation. It is immaterial that Rendition had no direct *commercial* relationship with NSB. *See Burt v. Board of Regents of University of Nebraska*, 757 F.2d 242, 244–45 (1985) ("Although the libel in *Calder* was pursuant to a commercial enterprise, whereas here the alleged defamation resulted from a single letter, we do not find this distinction significant in view of the Court's repeated emphasis in *Calder* on the intentional nature of the defendants' conduct and its calculated injurious effect in the forum state.").[7]

The facts are sufficient to demonstrate a prima facie showing of personal jurisdiction over Rendition.

D. Personal jurisdiction over Mr. Pavelchak

Mr. Pavelchak argues that this Court lacks personal jurisdiction over him because he merely functioned as Rendition's employee and otherwise had no relevant contacts with Vermont.

Personal jurisdiction over Mr. Pavelchak does not follow from the mere fact that he is employed by Rendition, which is subject to the court's jurisdiction. "[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984). Mr. Pavelchak's status as an employee does not "insulate" him from the court's jurisdiction either, however.

---

[7] Both Rendition and Pavelchak argue that jurisdiction is not appropriate in this forum because they did not even know that Plaintiff resided in Vermont. They take nothing from that point. They were plainly aware that he was employed in Vermont, that their work was part of a review of his performance by his employer in Vermont, and that their work would be used in that context and in that location.

27

Relying on out-of-state precedent, Mr. Pavelchak argues that he should be protected by the "fiduciary shield doctrine." That doctrine provides that "the acts of a corporate employee performed in his corporate capacity generally do not form the basis for jurisdiction over him in his individual capacity." *Estabrook v. Wetmore*, 529 A.2d 956, 958 (N.H. 1987).

Even assuming, *arguendo*, that Vermont would adopt that line of authority, it does not apply where the individual was the primary actor in the corporation's wrongdoing and had awareness of where his or her misconduct was directed. As the Court noted in *Estabrook*:

> We find nothing inequitable, however, in our State's asserting jurisdiction in a . . . suit over the non-resident corporate officer whose own acts for the corporation are the alleged cause of the injury here, so long as the pleadings show that the officer knew or should have known his conduct could have a direct, substantial effect in New Hampshire.

*Id.*; *see Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 907 (1st Cir. 1980) (jurisdiction appropriate if individual corporate actor is "guiding spirit" or "central figure" behind the misconduct); *Balance Dynamics Corp. v. Schmitt Industries, Inc.*, 204 F.3d 683, 698 (6th Cir. 2000) (jurisdiction appropriate over "corporate officers who actively and personally involved themselves in [mis]conduct").

Just so here. As was the case with the employee–defendants in *Calder*, per Plaintiff's allegations, Mr. Pavelchak was a "primary participant[]" in the alleged intentional tort, and jurisdiction over him "is proper on that basis." 465 U.S. at 790. The fiduciary shield doctrine, even if applicable, does not counsel a different result.

28

Mr. Pavelchak is not entitled to dismissal based on lack of jurisdiction.

Conclusion

In light of the foregoing, the NSB defendants' motion to dismiss is denied as to both breach of contract claims (Counts 1–2), the covenant of good faith (Count 3), the defamation claim (Count 5), and the IIED claim (Count 6); and is granted as to the violation of public policy claim (Count 4) is dismissed.

Mr. Lewis has established a prima facie showing of personal jurisdiction over Rendition and Mr. Pavelchak. Their motions to dismiss are denied.

The parties shall confer and submit a scheduling order to the Court within 30 days.

Dated this __ day of January 2020 at Montpelier, Vermont.

_____
Timothy B. Tomasi,
Superior Court Judge